NOT DESIGNATED FOR PUBLICATION

No. 124,324

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JONELL LLOYD,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed November 4, 2022. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., GREEN and HILL, JJ.

PER CURIAM: Jonell Lloyd was convicted in 2009 of first-degree murder. After a lengthy direct appeal and remand, Lloyd filed a habeas-corpus motion claiming his trial attorney provided constitutionally defective representation when the attorney did not move to suppress the statements made by one of the State's key witnesses—Lloyd's former girlfriend and housemate—during the investigation. The district court denied the motion without holding an evidentiary hearing, finding Lloyd had not shown that suppression of these statements could have changed the outcome of his trial. We agree and affirm the district court's decision.

1

FACTUAL AND PROCEDURAL BACKGROUND

In 2009, a jury convicted Lloyd of first-degree murder, on theories of premeditation and felony murder, for the July 2008 death of his presumed 17-month-old daughter, Chavira Brown. The jury also convicted Lloyd of abuse of a child. The district court imposed a life sentence without the possibility of parole for 50 years (what Kansas courts call a hard-50 sentence) plus 128 months in prison. Lloyd appealed his convictions and sentence to the Kansas Supreme Court. The tragic facts of this case are known to the parties and were summarized by the Supreme Court in its opinion. See *State v. Lloyd*, 299 Kan. 620, 622-26, 325 P.3d 1122 (2014) (*Lloyd I*).

The Supreme Court affirmed Lloyd's convictions during his direct appeal but vacated his sentence and remanded for a new sentencing proceeding. 299 Kan. at 645. In that appeal, Lloyd argued, in part, that the district court erred in denying his motion to strike the pretrial statements and trial testimony of one of the State's key witnesses, Tameika Loudermilk—his former girlfriend with whom he lived at the time of the murder. Lloyd also argued the evidence was not sufficient to support his premeditated first-degree murder conviction and reversible error occurred when the district court admitted evidence of another crime. The Kansas Supreme Court rejected these arguments, holding that the district court correctly denied Lloyd's motion to strike the pretrial statements and trial testimony of Loudermilk because it was untimely and imprecise. 299 Kan. at 627-32, 636, 641, 645.

In December 2015, on remand from the Kansas Supreme Court, another jury considered whether aggravating factors existed that would allow the district court to impose a hard-50 sentence. The jury found that Lloyd was previously convicted of a felony in which he inflicted on another great bodily harm, disfigurement, dismemberment, or death. The jury also found that Lloyd had committed the

2

premeditated first-degree murder in an especially heinous, atrocious, or cruel manner that was not outweighed by any mitigating circumstances. Yet again, the district court sentenced Lloyd to a hard-50 life term plus 128 months in prison. Lloyd appealed, and the Kansas Supreme Court affirmed his sentence. *State v. Lloyd*, 308 Kan. 735, 742, 423 P.3d 517 (2018) (*Lloyd II*).

In *Lloyd II*, Lloyd argued that his sentence should be set aside because the district court committed reversible error when it allowed the State to present Loudermilk's pretrial statements and trial testimony after the State could not locate her. He also argued that the State failed to present sufficient evidence that he had a felony conviction for a crime in which he inflicted great bodily harm, disfigurement, dismemberment, or death. The Kansas Supreme Court rejected his arguments. 308 Kan. at 739-42.

*Loudermilk's Pretrial Statements and Trial Testimony*

Some additional background concerning Loudermilk's testimony and other pretrial statements is necessary for our discussion. The Kansas Supreme Court described Loudermilk's initial encounters with police in *Lloyd I*:

> "[When police officers arrived at the house where Loudermilk and Lloyd were living, Loudermilk] initially denied knowing Lloyd. But after another person told officers Lloyd lived there, Loudermilk admitted Lloyd had been at the house, but she did not know his whereabouts and had not seen Chavira recently. Police arrested Loudermilk for obstruction and took her into custody, which led to a series of interviews at the police station that began after midnight. Loudermilk's statements to investigators and her trial testimony were central to the investigation and prosecution and play prominently in the conviction-related issues on appeal.
>
> "Detective Brian Hightower first interviewed Loudermilk. She initially repeated that she did not know Chavira's whereabouts, but she did describe how Lloyd had shouted at Chavira because she wet herself. At 2:53 a.m., Officer Michael John Nagy took over the interview and admits he was 'pretty rough' in his questioning in order to get

3

Loudermilk to tell where Chavira was. Nagy was aware Loudermilk's infant son was in protective custody after her arrest, so he told Loudermilk he would help get her son back from protective custody if she cooperated. He also told her she would 'be in a world of hurt' if she did not help locate Chavira. But Loudermilk offered no additional information. Nagy then changed tactics.

"Nagy told Loudermilk she would go to jail for a long time if something bad happened to Chavira; and, if that happened, her son would go into 'the system' and she would be unable to see him. Toward the end of this interview, Nagy told Loudermilk he was going to get the truth from another witness who had talked to Lloyd and knew what happened. Nagy told her to think about whether charging her with murder was fair to her and her son. He then left the room and Detective Lennie Rose entered. At around 4:45 a.m., Loudermilk made statements incriminating Lloyd—most critically, she said she thought Chavira was in the attic of the house.

"Officers secured a search warrant and discovered in the attic what they initially described as a black bag, which was actually a sofa cushion cover filled with three black plastic trash bags, one bag inside the other, and 'knotted, tied.' The innermost bag contained Chavira's body." *Lloyd I*, 299 Kan. at 623-24.

Loudermilk also testified as a witness for the State at Lloyd's jury trial. During her testimony, she explained in detail her observations of Lloyd hitting Chavira with a belt for about 20 minutes after the child had wet herself. She stated that she later walked through the living room and saw Lloyd with his hand around the backside of Chavira's neck while the child was crying. She continued to hear Chavira cry and make noise for 10 to 15 minutes as though she could barely breathe. Loudermilk also testified that Lloyd told Chavira's mother that Chavira had gone missing at the park and instructed Loudermilk to say she did not know Chavira's whereabouts or what had happened. Loudermilk testified that at that time, she believed Chavira was dead. After Loudermilk testified, the State called a Wichita police detective to summarize Loudermilk's statements during the original police interviews on the day Chavira died.

During his defense, Lloyd called Detective Hightower and Officer Nagy to testify about the tactics used at Loudermilk's police interview—namely, threats that her child would be taken away and that she would face criminal charges (including being implicated in Chavira's murder). Lloyd then asked the court to strike Loudermilk's pretrial statements (described by the other detective at trial) and her trial testimony, claiming both were coerced. The district court denied these requests, indicating the evidence had already been presented to the jury.

At Lloyd's sentencing trial on remand from his direct appeal, he objected to the admission of Loudermilk's trial testimony on the ground that she was coerced into making those statements. He did not object to the admission of her pretrial statements to police. The second sentencing court held that "any putative coercion exercised by the State in threatening a parental rights proceeding was attenuated by the fact that the proceeding was completed before Loudermilk testified in the first trial." *Lloyd II*, 308 Kan. at 739-40. The Kansas Supreme Court held that the lack of objection to the admission of Loudermilk's statements to the investigators meant they could not find error in admitting the statements. 308 Kan. at 740. Regarding Loudermilk's trial testimony admitted via transcript, the Kansas Supreme Court "assume[d] without deciding that the admission of Loudermilk's transcribed testimony was erroneous," but nevertheless determined that any error with the admission was constitutionally harmless because Loudermilk's "trial testimony did not recant previous statements to the police and gave no reason to believe that her sworn testimony reaffirming the earlier statements was untruthful or inaccurate." 308 Kan. at 740-41.

*Lloyd's Habeas-Corpus Motion*

In June 2019, Lloyd filed a K.S.A. 60-1507 motion alleging his conviction resulted from the breach of his constitutional rights. Though Lloyd initially raised several claims, later proceedings narrowed the issues to two questions:

5

(1) Whether Lloyd received ineffective assistance when his trial counsel failed to file a motion to suppress Loudermilk's statements to law enforcement and preclude her testimony at trial, as well as failing to lodge a timely objection to the same testimony.

(2) Whether Lloyd's rights were violated when the prosecution relied on improper inference stacking in closing argument.

In January 2021, the district court held a preliminary hearing on these two issues. Lloyd's counsel explained that Loudermilk's testimony was "critical for the State's case," and there was no "significant challenge to that testimony" by Lloyd's trial counsel. The district court also gave Lloyd a chance to speak to prejudice first-hand, and Lloyd generally alleged that if Loudermilk had not been coerced, she would not have testified that Lloyd committed any crime. The district court took the matter under advisement.

The district court later denied Lloyd's motion, concluding that the files and records of the case reflected that Lloyd was not entitled to relief. The district court rejected Lloyd's claim on inference stacking, as it had been resolved in his direct appeal. And the court was similarly unpersuaded by Lloyd's claim of ineffective assistance of counsel, finding Lloyd was not prejudiced by his counsel's performance.

The court recognized that Lloyd's claim of coercion was based on the police threatening Loudermilk with a child-in-need-of-care (CINC) proceeding and criminal charges during her post-arrest questioning. But the court noted that Loudermilk testified at trial that those two potentially coercive pressure points no longer existed:

> "Ms. Loudermilk was not charged in connection with the murder, and was under no credible threat of being charged. Further, the State had proceeded with the CINC case

6

against her, resulting in her children being taken from her, resulting in her children being taken from her custody. Thus, to the extent these two factors may have been coercive at the time of the interview, they could not have coerced her testimony at trial."

The district court also was unpersuaded by Lloyd's assertion that the CINC proceeding involving Loudermilk's children technically remained pending at the time of trial because Loudermilk "testified at trial that she believed the CINC matter had been concluded."

Given these realities, the court found that even if a motion to suppress Loudermilk's pretrial statements would have been successful, Lloyd had not shown any basis to believe that Loudermilk's testimony at trial was not voluntary. Thus, the district court found Lloyd could not show any prejudice from the absence of any motion to suppress her statements, and the court denied Lloyd's K.S.A. 60-1507 motion. Lloyd appeals.

DISCUSSION

A K.S.A. 60-1507 motion provides a vehicle where someone can collaterally challenge the fairness of the underlying proceedings that resulted in his or her criminal conviction. See K.S.A. 2021 Supp. 60-1507(a). A district court may address such a motion in three ways, and our standard of review is different for each three possible dispositions. First, the district court may summarily deny the motion without a hearing if the motion, files, and records from the case conclusively show the movant is not entitled to relief. Second, if the motion presents a potentially substantial issue, the district court may order a preliminary hearing and appoint the movant counsel. Third, when "the motion and the files and records of the case" do not "conclusively show that the prisoner is entitled to no relief," the court must hold an evidentiary hearing. K.S.A. 2021 Supp. 60-1507(b); *Hayes v. State*, 307 Kan. 9, 12, 404 P.3d 676 (2017). Here, the district court took the second route and held a preliminary hearing on Lloyd's motion, after which it denied his motion without an evidentiary hearing.

7

When the district court denies a K.S.A. 60-1507 motion based only on the motions, files, and records after a preliminary hearing, as the district court did here, the appellate court is in just as good a position as the district court to consider the merits. Therefore, the standard of review is de novo. *Grossman v. State*, 300 Kan. 1058, 1061, 337 P.3d 687 (2014); *Calhoun v. State*, 56 Kan App. 2d 185, 193, 426 P.3d 519 (2018), *rev. denied* 309 Kan. 1347 (2019).

The Sixth Amendment to the United States Constitution guarantees criminal defendants the effective assistance of an attorney. See U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A person asserting the denial of that right must show that his or her attorney's performance was constitutionally deficient, and that this deficiency prejudiced the person so much as to deprive him or her of a fair trial. 466 U.S. at 687; *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting the *Strickland* approach in Kansas).

An attorney provides deficient representation when his or her conduct was objectively unreasonable. *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012). Courts are highly deferential when reviewing an attorney's performance and make every effort "'to eliminate the distorting effects of hindsight.'" 294 Kan. at 838. Accordingly, a strong presumption exists that the attorney performed reasonably. 294 Kan. at 838. Under the prejudice inquiry, a person must show "'a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.'" 294 Kan. at 838.

Applying these principles to the facts before us, the district court assumed Lloyd's trial counsel was deficient for failing to file a motion to suppress Loudermilk's pretrial statements and trial testimony. We, too, will presume this deficiency, given law enforcement's tactics during Loudermilk's original police interviews. But like the district

court, we conclude that Lloyd has not met the prejudice prong of the *Strickland* analysis because Loudermilk voluntarily testified at trial.

Lloyd is correct that the coerced statements of a witness can deprive him of a fair trial. See *State v. Daniels*, 278 Kan. 53, 65, 91 P.3d 1147 (2004). But even if we assume that a suppression motion by Lloyd's counsel regarding Loudermilk's pretrial statements would have been successful, Loudermilk's later trial testimony would only be excluded if it remained tainted, and thus involuntary, due to the police officers' earlier coercive tactics. See *State v. Swanigan*, 279 Kan. 18, 40-44, 106 P.3d 39 (2005) (A later statement by a witness is admissible, even when an earlier statement may have been tainted by coercion, when it is clear from the totality of the circumstances that the later statement is voluntary.); *State v. Shumway*, 30 Kan. App. 2d 836, 842, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002) (same).

The district court held that the record demonstrated that Loudermilk's trial testimony was not coerced because the two original and strongest potentially coercive factors—the threat to take her kids away and criminal charges—were not present at the time of trial. We agree.

Lloyd's trial occurred approximately 11 months after Chavira's death and after Loudermilk's original police interviews. At the trial, both the prosecutor and defense attorney had the opportunity to question her about the two pressure points that the law enforcement officers had previously placed on her:

- Loudermilk testified that she believed the CINC action involving her children was over, as her children had been removed from home and would not be returned. Though it is unclear from the record as to whether this CINC action was formally concluded, Loudermilk explained that from her perspective, "It [was] over."

9

- Loudermilk testified at trial that she recalled being told that she was in a world of hurt but did not recall law enforcement officers telling her she could go to jail for a long time. Thus, there was no indication at trial that she recalled the officer's threat. And as the district court held, Lloyd had not provided any claim that the threat of criminal charges remained present at the time of trial; Loudermilk was not charged at that time or under any credible threat of being charged.

Thus, Loudermilk testified at trial that the previous threats that may have rendered her statements inadmissible no longer were present. Lloyd has not provided any explanation, other than second-guessing Loudermilk's credibility at trial, as to why her testimony was not voluntary. Without more, Lloyd's conclusory assertions cannot succeed when contradicted by the evidence in the record.

Loudermilk's voluntary trial testimony described the events surrounding Chavira's death in much greater detail than she had previously shared with the detectives. Lloyd has not shown a reasonable probability that the outcome of his trial would have been different if Loudermilk's pretrial statements to the police had been suppressed. The district court did not err when it summarily denied Lloyd's K.S.A. 60-1507 motion.

Affirmed.